UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

_____
                                  )
UNITED STATES OF AMERICA,         )
                                  )      CASE NO. 4:21-cr-54
          Plaintiff,              )
                                  )
     vs.                          )      TRANSCRIPT OF
                                  )      JURY TRIAL PROCEEDINGS
                                  )
JEFFREY ALLAN KOCK,               )      VOLUME III
                                  )
          Defendant.              )
_____

                                  COURTROOM 265, SECOND FLOOR
                                  U.S. COURTHOUSE
                                  123 East Walnut Street
                                  Des Moines, Iowa 50309
                                  Wednesday, September 29, 2021
                                  8:41 a.m.

BEFORE:   THE HONORABLE REBECCA GOODGAME EBINGER, DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:           ANDREW KAHL
                             DEBRA SCORPINITI
                             United States Attorney's Office
                             U.S. Courthouse Annex
                             110 East Court Avenue, Suite 286
                             Des Moines, IA 50309


For the Defendant:           JEFFREY ALLAN KOCK, PRO SE

Standby Counsel:             MACKENZI NASH
                             Federal Public Defender's Office
                             400 Locust Street, Suite 340
                             Des Moines, IA 50309



                Chelsey Wheeler, CSR, RPR, FCRR
                   United States Courthouse
                    123 East Walnut Street
                   Des Moines, IA 50309

**I N D E X**

GOVERNMENT'S WITNESSES                                    PAGE

BRYAN YORK
Direct Examination By Mr. Kahl                            527
Cross-Examination By Mr. Kock                             535

SCOTT STECKEL
Direct Examination By Mr. Kahl                            539
Cross-Examination By Mr. Kock                             551

**E X H I B I T S**

| GOVERNMENT'S EXHIBITS | | OFFERED | RECEIVED |
|---|---|---|---|
| 415 | Complaint | 543 | 543 |
| 616 | Inspection Report | 534 | 534 |
| 617 | Copy of Tax Return | 533 | 533 |
| 618 | Photograph | 531 | 532 |

P R O C E E D I N G S

(In open court, with the defendant present, outside the presence of the jury.)

THE COURT:  Thank you.  Please be seated.

We're back on the record outside the presence of the jury in the matter of the United States of America versus Jeffrey Allan Kock, 4:21-cr-54.

We are here on the third morning of trial.  Counsel is present as is the defendant.

We circulated this morning a final version of the final jury instructions consistent with the record we made yesterday in open court on the final instructions.

Mr. Kahl, have you had the opportunity to review these instructions on behalf of the Government?

MR. KAHL:  Yes, Your Honor.

THE COURT:  And do they conform to the record we made at the end of the day yesterday?

MR. KAHL:  They do.

THE COURT:  Thank you.

Mr. Kock?

THE DEFENDANT:  Good morning.

THE COURT:  Good morning, sir.

Have you had the opportunity to review these final jury instructions?

THE DEFENDANT:  No, I haven't, actually.

THE COURT:  Okay.  Why don't you take a moment to do that.

THE DEFENDANT:  Yeah, I'm good with it.

THE COURT:  The final instructions as you've been given them this morning comport with the record we made yesterday afternoon; correct?

THE DEFENDANT:  Yes.  Correct.

THE COURT:  Okay.  So we'll prepare those after we make our record here this morning before the jury.  I have not recirculated the verdict form because the verdict form is identical to what the form looked like yesterday when we made our record.

Mr. Kock, yesterday you indicated to me that it was your intent to testify, and then you suggested that you may contemplate that further, and you wanted to make a final decision about that this morning.

Have you made a final decision about your intent in regards to your testimony yet today?

THE DEFENDANT:  Yes.  I won't be testifying.

THE COURT:  You will?

THE DEFENDANT:  No.  No.

THE COURT:  You will not be testifying?

THE DEFENDANT:  Will not be.

THE COURT:  Okay.  So the instructions that we just read included references to your testimony.

THE DEFENDANT: So we amend them as --

THE COURT: As we discussed.

THE DEFENDANT: -- as indicated yesterday? Yeah, as discussed.

THE COURT: So we'll strike the last sentence on Final Instruction No. 5. And then in Instruction No. 4, there's a reference to your testimony under oath from the witness stand, and we'll take that out. And then we will add in, in Final Instruction No. 6, the language about "you are to not consider in any way the fact that the defendant didn't testify."

Correct, Mr. Kock?

THE DEFENDANT: I believe so.

THE COURT: Mr. Kahl?

MR. KAHL: Yes, Your Honor.

THE COURT: Okay. So we'll prepare those instructions as consistent with the defendant not testifying, consistent with the record we just made.

Mr. Kahl, anything the Government needs to bring to my attention?

MR. KAHL: Two, minor housekeeping issues. One in terms of the order of witnesses this morning. It's our intention to start with Mr. York and then to finish with Mr. Steckel. I advised Ms. Nash and Mr. Kock that's how we intended to proceed.

Secondly, regarding the original exhibits, I know we

had some discussion earlier in the trial regarding the original Treasury checks, and we agreed that the original Treasury checks would be marked as 408 and 409 and then the electronic version says 408A and 409A.

Another original document we have is Exhibit 304, and that's the original 2019 return.  We have been working with the electronic version which is identical to the original version of Exhibit 304.  I suppose to be consistent, we ought to mark the electronic version as 304A.

Would that be consistent with the Court's expectation?

THE COURT:  That's different, in my mind, because of the fact that the check itself is a negotiable instrument, and while the documents are certified, they're identical in the electronic record and in the hard copy record --

MR. KAHL:  Yes.

THE COURT:  -- and so I don't see any reason to mark those differently.  And when the jury gets them, it would seem to me that the record would be clear that they're looking at documents either on a screen or in hard copy in the same way they would any other document that's admitted into evidence.

MR. KAHL:  That's fine, Your Honor.  Thank you.

THE COURT:  Thank you for bringing that issue to my attention.

Mr. Kock, do you have anything you need to bring to my attention relevant to the proceedings today?

THE DEFENDANT:  I do not believe so.

THE COURT:  Okay.  I am aware that all of the jurors are here, so we can begin now with the Government's next witness.

We'll bring in the jury at this time.

(Jury entered the courtroom at 8:56 a.m.)

THE COURT:  Thank you.  Please be seated.

Good morning.  We are back on the record in the presence of the jury on the third morning of trial in the case of United States of America versus Jeffrey Allan Kock, Case No. 4:21-cr-54.

When we left off yesterday, the Government was still presenting their case in chief.

Mr. Kahl, is the Government prepared to call its next witness?

MR. KAHL:  The United States calls Bryan York.

THE COURT:  Thank you.

Thank you, Mr. York.  Please come forward.

THE WITNESS:  This way here?

THE COURT:  You're going to come this way first, and you're going to raise your right hand and prepare to be sworn.

BRYAN YORK, GOVERNMENT'S WITNESS, SWORN

THE COURT:  Thank you.  You may be seated.

Sir, in order for the jury to observe your countenance while testifying, you're going to have to remove your face

mask.  If you're uncomfortable testifying without a face covering, I do have face shields available.

Would you like a face shield, sir?

THE WITNESS:  No, Your Honor.

THE COURT:  Would you please a state and spell your full name for the record.

THE WITNESS:  My name is Bryan York, B-r-y-a-n Y-o-r-k.

THE COURT:  Thank you, sir.

Your witness, Counsel.

MR. KAHL:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. KAHL:

Q.  Mr. York, will you tell us what you do for a living.

A.  I'm a realtor.

Q.  What agency do you work for?

A.  Remax Concepts.

Q.  And is that here in the Des Moines area?

A.  Yes, sir.

Q.  How long have you been a realtor?

A.  About five years.

Q.  And do you have any particular area of specialty or area of focus?

A.  Mostly northwest, Johnston, Urbandale, West Des Moines, things of that nature.

Q.   And did you receive a subpoena to testify in this trial and provide certain documents?

A.   Yes, sir, I did.

MR. KAHL:   I would like to publish Exhibit 412, which is already in evidence, Your Honor.

THE COURT:   Yes.

(Exhibit 412 was displayed.)

BY MR. KAHL:

Q.   Do you see that exhibit on the screen in front of you?

A.   Yes, sir.

Q.   And what does that appear to be?

A.   It appears to be a copy of the earnest money check for the transaction.

Q.   Okay.  Who is it signed by?

A.   Jeffrey Kock.

Q.   And what was the check for?

A.   Earnest money for the transaction for buying the property.

Q.   And buying what property?

A.   11 -- excuse me.  10075 Northwest Beaver Ave.

Q.   Is that out towards Saylorville Lake?

A.   Or Beaver Drive.  Excuse me.  Yes, sir.  Yes, it is.

Q.   And what is the date of this check?

A.   March 1, 2020.

Q.   You mentioned a transaction.  What was your role in the transaction?

A.   To represent Mr. Kock as his realtor.

Q.   How did he first contact you?

A.   By way of a lead on realtor.com.  When you click on a property, it sends it to an agent, and an agent like myself responds and schedules a showing.

Q.   When did Mr. Kock initially reach out to you?

A.   Honestly, I can't recall the date, to be honest with you. However, I do know that it's part of the subpoena, so it's of record.  It was provided, but, to be honest with you, I can't tell you off the top of my head what day it was.

Q.   Well, do you recall what month it was?

A.   Yeah.  I believe it was January or -- late January or early February, yeah.

Q.   Of 2020?

A.   Yeah.

Q.   And you mentioned the property on Northwest Beaver Drive. Was any offer made to purchase that property by Mr. Kock?

A.   Yes.

Q.   Was there any negotiation over the purchase price?

A.   No.  Not a lot, no.  In fact, no.  No, there was very little over the price of the home.  It was more of some of the things that were in the home.

Q.   Do you recall what the purchase price was to be?

A.   I believe it was -- on that one, I believe it was 2.7 million, I believe is what it was on that one.

Q.   Was that the list price?

A.   Yeah.

Q.   And there wasn't any haggling over the price?

A.   No.   It was more of just things in -- you know, personal items in the home.

Q.   How was the defendant, Mr. Kock, going to pay for this property?

A.   He said that he was waiting on a check and would be paying for the property that way when he received his funds.

Q.   And at some point did he indicate to you that he had received these funds?

A.   He did.

Q.   And would that have been around March 1?

A.   Yeah.   Yeah.   Roughly, yeah.   I recall -- and, again, I don't recall the date, but I recall receiving a message from him.   I believe it was on a Friday.   He had said that he received his funds, and he was -- maybe it was a Saturday, actually.   It was Saturday morning, and then he was depositing them, and he did.

Q.   And did Mr. Kock provide you with any documentation about that deposit?

A.   He did.   At first, it was a picture of the deposit slip, and then it was -- I believe her name was Tifa, the banker, sent over a letter that, in fact, he had deposited those funds.

            MR. KAHL:   I would like to ask the witness only to

review Exhibit 618 with the Court's permission.

THE COURT:  Yes.

(Exhibit 618 was displayed for the witness.)

BY MR. KAHL:

Q.  Do you see Exhibit 618 in front of you?

A.  I do.

Q.  And what is that?

A.  That is the picture of the deposit slip that he sent me.

Q.  And did you take that picture on your phone?

A.  I did not take that picture.

Q.  He sent the picture to you?

A.  He sent that picture to me.

Q.  And is there a date associated with this photograph?

A.  Yeah.  It is the 2nd of March 2020.

Q.  Does it appear to be a deposit?

A.  Yes, it appears so.

Q.  Is there a date on the top of the exhibit in the black area?

A.  February 29, 2020, at 11:03.

Q.  Would that indicate that that's the date of the photograph?

A.  I guess that's -- I guess I'm not sure.  I'm not sure.

Q.  Okay.

MR. KAHL:  The Government moves admission of 618.

THE COURT:  Any objection to 618?

MR. KOCK:  No objection.

THE COURT:   618 is admitted.

MR. KAHL:   May we publish?

THE COURT:   Yes.

(Exhibit 618 was displayed.)

BY MR. KAHL:

Q.   Now that the jury can see this, can you indicate the amount of the deposit indicated on this deposit slip?

A.   I do have a question, though.

Q.   Well, I --

A.   No?   No?   Okay.   Go ahead.   I'm sorry.

Q.   Can you indicate the amount of the deposit on that document?

A.   It looks to be $10,921,192.

MR. KAHL:   I would like the witness only, Your Honor, to review Exhibit 617.

THE COURT:   Yes.

(Exhibit 617 was displayed for the witness.)

BY MR. KAHL:

Q.   Do you see Exhibit 617?

A.   Yes, sir.

Q.   Have you seen that before?

A.   Yes, I have.

Q.   And is that something that Mr. Kock provided you as further verification of his funds?

A.   Yes, sir.

MR. KAHL:  The Government moves admission of 617.

THE COURT:  Any objection to 617?

MR. KOCK:  No objection.

MR. KAHL:  May we publish, Your Honor?

THE COURT:  It is admitted, and you may publish.

MR. KAHL:  Thank you, Your Honor.

(Exhibit 617 was displayed.)

BY MR. KAHL:

Q.  And what does Exhibit 617 appear to be?

A.  I'm sorry?

Q.  What does this document appear to be?

A.  It appears to be a 1041 U.S. tax return.

Q.  And is that just a portion of the return that was maintained in your deal file?

A.  Yeah.  Yes, sir.

MR. KAHL:  Finally, I would like the witness only to look at Exhibit 616.

THE COURT:  You may.

(Exhibit 616 was displayed for the witness.)

BY MR. KAHL:

Q.  What's Exhibit 616?

A.  This is the inspection report for the property.

Q.  And is that just the first page of the inspection report?

A.  Yes, sir.

Q.  It includes a photograph of the property we're talking

about?

A.   Yes, sir.

          MR. KAHL:  The Government moves admission of Exhibit 616.

          THE COURT:  Any objection to 616?

          MR. KOCK:  No objection.

          THE COURT:  616 is admitted.

          MR. KAHL:  May we publish?

          THE COURT:  Yes.

          (Exhibit 616 was displayed.)

BY MR. KAHL:

Q.   And so the transaction got far enough that you did an inspection?

A.   Yes, sir.

Q.   Did the deal ultimately go through?

A.   Did the deal go through?  No, sir.

Q.   Why not?

A.   Well, his funds -- he no longer had access to his funds, for whatever reason.  The bank reached out, called and said that he was no longer --

          MR. KOCK:  Objection.  Hearsay.

          THE COURT:  Could you ask a question, Mr. Kahl.

          MR. KAHL:  Yes.

BY MR. KAHL:

Q.   What did Mr. Kock tell you about why the deal had fallen

through?

A.   Mr. Kock stated that Bankers Trust had -- I'm trying to think of the word that he used, but basically had taken his funds.

Q.   And so the funds were not available for the transaction?

A.   Correct.

        MR. KAHL:   Nothing further, Your Honor.

        THE COURT:   Cross-examination?

                    CROSS-EXAMINATION

BY MR. KOCK:

Q.   Good morning, Mr. York.   Thanks for being here.

     Can you tell the Court the process of how real estate transactions are documented?

A.   Sure.   From start to finish?

Q.   Please.

A.   Well, initially, I meet with you; we discuss the property that someone is looking to buy; then we go and we look at said properties, we make offers, we submit proof of funds. Sometimes if it's not cash, it's a preapproval letter.

     And then once the offer is made, we submit the offer, and then all documents from there are kept within our files all the way through closing and then thereafter.

     Can you be a little bit more specific?

        THE COURT:   Mr. York, the witness can't ask questions.

        THE WITNESS:   Okay.

THE COURT:  The witness gets to be asked questions.

THE WITNESS:  Fair enough.

THE COURT:  And so Mr. Kock will now ask you another question.  Thank you for listening carefully to the questions asked and answering those questions.

THE WITNESS:  Yes, Your Honor.

THE COURT:  Mr. Kock.

BY MR. KOCK:

Q.  Okay.  Can you repeat the last sentence you -- before your question, can you repeat the last thing that you said?

THE COURT:  Would you like the reporter to read that back?

MR. KOCK:  Oh, please.  Please.  I'm sorry.

THE COURT:  Ms. Wheeler, would you please read back the sentence prior to the witness's question.

(The requested portion of the record was read back by the court reporter.)

BY MR. KOCK:

Q.  Okay.  Mr. York, when does that process become public?

A.  There is very little in a normal situation where things of the deal become public aside from the closing.  It is public record as to the cost of the home, as that is recorded.  However, the rest of the deal is not what I would refer to as public.

Q.  Okay.  So would that mean it would be private, then?

A.   Yes, it would be private.

Q.   Okay.  How do -- how were you taught to deal with checks for earnest money as a realtor?

A.   How was I taught to deal with checks?  I was taught to deal with checks by taking copies of them and providing copies of them to the other side of the transaction to verify funds and keeping them within our file known as Dotloop.

Q.   What are realtors taught about what a check is, the definition of a check?  Do they talk about that at all?

A.   No.  No.

Q.   Okay.  Okay.  Just to reiterate, going back to the public process, upon closing, the closing table and then the final process, what happens then?

A.   Can you repeat the question?

Q.   Oh, yeah.  At the closing -- all right.  Okay.  Reiterating, at the closing table, after the deal is closed, the deed is recorded, and it becomes a public -- it becomes a part of public record; is that correct?

A.   Correct.

Q.   Okay.  Okay.

          MR. KOCK:  No further questions, Your Honor.

          THE COURT:  Redirect examination?

          MR. KAHL:  No.  Thank you, Your Honor.

          THE COURT:  Thank you, Mr. York.  You may step down.

          Additional evidence on behalf of the Government?

MR. KAHL:  The United States calls Scott Steckel.

THE COURT:  Thank you.

Mr. Steckel, please step forward.

Please raise your right hand and prepare to be sworn.

SCOTT STECKEL, GOVERNMENT'S WITNESS, SWORN

THE COURT:  Thank you, sir.  Please step to the witness stand.

Sir, in order for the jury to observe your countenance while testifying, I'm going to ask you to remove your face mask.  If you're uncomfortable testifying without a face covering, I do have a face shield available.

Would you like a face shield, sir?

THE WITNESS:  I'm okay with the face covering.  My hearing is a little bit off, so as long as --

THE COURT:  You must remove your mask so the jury can observe your face while testifying.

THE WITNESS:  Okay.

THE COURT:  If you are uncomfortable with that, I can give you a face shield.

THE WITNESS:  I'm fine.  Thank you.

THE COURT:  Okay.  Would you please state and spell your full name for the record.

THE WITNESS:  My name is Scott David Steckel, S-t-e-c-k-e-l.

THE COURT:  Your witness, Counsel.

MR. KAHL:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. KAHL:

Q.  Mr. Steckel, where do you work?

A.  I'm sorry?

Q.  Where do you work?

A.  Where do I live?  I currently -- where do I work, or where do I live?  I'm sorry.  With the mask, it's difficult with my hearing.  I apologize.

MR. KAHL:  I'll speak up into the microphone.

THE COURT:  Thank you.

Could you hear Mr. Kahl at that point?

A.  Like I said, my hearing is little bit off, but, again, the question is:  Where do I work?

BY MR. KAHL:

Q.  Correct.

A.  I work for the Consumer Financial Protection Bureau in Washington, D.C.

Q.  And what's the Consumer Financial Protection Bureau?

A.  The CFPB was created by Congress as a single point of accountability to enforce federal consumer financial law and protect consumers in the marketplace.

So we do this, again, by supervising large banks, financial companies.  We do this by enforcing federal consumer financial law, and we handle consumer complaints from individual

consumers.

Q.   What is your specific job within the CFPB?

A.   My job is as the stakeholder engagement program manager with the Office of Consumer Response.  And the Office of Consumer Response, we were created to handle consumer complaints about financial products and services.  We route complaints to financial companies, to the large banks that we supervise, and/or we route complaints to other federal or state agencies as appropriate.

THE COURT:  Mr. Steckel, if you could please make sure you speak slowly so that we can accurately get the record down.

THE WITNESS:  Gotcha.

THE COURT:  Thank you, sir.

THE WITNESS:  Sure.

THE COURT:  Mr. Kahl.

MR. KAHL:  Thank you, Your Honor.

BY MR. KAHL:

Q.   Mr. Steckel how long have you worked for the CFPB?

A.   A little over ten years now.

Q.   And how long has the CFPB been around?

A.   The CFPB first started -- CFPB was created in 2010.  The CFPB opened its doors officially on July 21 of 2011.

Q.   And you started work shortly thereafter?

A.   I started work August 1 of that year.

Q.   What had you done before your employment with the CFPB?

A.   Prior to that, I worked with the FDIC, the Federal Deposit Insurance Corporation.  I was certified in deposit insurance claims at the FDIC.

Q.   And prior to that?

A.   I was in banking, consumer banking and mortgage banking, for about 20 years.

Q.   Does the Consumer Financial Protection Bureau have a centralized consumer complaint process?

A.   Yes.  That's managed by the Office of Consumer Response.

Q.   Are you familiar with that process?

A.   Yes.

Q.   And how does it work?

A.   What we do is we set up -- we have a toll-free telephone number that consumers can call us to submit a complaint about a consumer financial product or service.  We have a website.  Our website is consumerfinance.gov.  Consumers can submit a complaint if they've got a problem with a bank, a nonbank company.

We accept the complaint, and, again, we route it to the company and work to get the consumer a response to their issue. Where appropriate, we route to the complaint to another federal agency for handling.

Q.   How many complaints do you receive in an average month?

A.   Most recently, since the pandemic, complaint volume has really increased.  We used to be averaging about 50,000

consumer complaints a month.  Lately we're up to about 75,000 consumer complaints about a wide range of financial products and services.

Q.  Now, once a complaint is received -- and I want to focus on complaints submitted over the Internet.  What is the process once a complaint is made?

A.  When the complaint comes to our office, what we do is we screen the complaint for completeness.  There's some required information:  The consumer needs to identify themselves; the consumer needs to tell us what happened; they need to identify the company they're having the issue with; they need to tell us what product or service they're having a problem with; what they want the company to do about it.

If we get all of that information and it's complete, we send it to the financial company that the consumer identified, or in the case of certain companies that are regulated by other institutions, we would route it to that regulator.

MR. KAHL:  I would like the witness only, Your Honor, to review Exhibit 415.

THE COURT:  You may do so at this time.

(Exhibit 415 was displayed for the witness.)

BY MR. KAHL:

Q.  Do you see the first page of Exhibit 415 in front of you?

A.  Yes.  Yes.

Q.  And what is it?

A.   This looks like a printed -- a print version -- it looks like a CFPB complaint that was submitted on March 16 of 2020. And, again, this looks like page 1 of a consumer complaint.

Q.   And who is the primary consumer submitting this complaint?

A.   This one -- I'm not sure if I'm pronouncing -- the primary consumer here would be a Jeffrey Allan Kock listed on the bottom of the page here.

Q.   And is this a multipage document?

A.   This should be -- there should be a number of pages to this, yes.

Q.   And did you have a chance to review a copy of Exhibit 415 prior to coming into court today?

A.   I did.  Yes, I reviewed this.  I reviewed this in our system.

Q.   And is Exhibit 415 a true and accurate printout of a complaint that you found in your system?

A.   This looks exactly like the complaint that was in our system.

        MR. KAHL:  The Government moves admission of Exhibit 415.

        THE COURT:  Any objection to 415?

        MR. KOCK:  No objection.

        THE COURT:  415 is admitted.

        MR. KAHL:  May we publish, Your Honor?

        THE COURT:  Yes.

(Exhibit 415 was displayed.)

BY MR. KAHL:

Q. And taking a look, first, at the top half of the first page, is that the date submitted that you just referenced?

A. Yeah. At the top, that would be the date and time submitted, March 16 of 2020, and you can see how that matches with the beginning prefix on the complaint number on the very top left.

Q. So that number on the top left is your unique identifying number for this complaint?

A. Yeah. The way we do the complaint numbers is on the left side, as you can see, it's the year, month, and date. And then each day we start the sequence over. So after the dash, this is just a random number generated for complaints.

Q. And does this section of the form indicate what happened with this complaint?

A. Well, I mentioned, you know, how we send complaints to companies or refer them, but, if you look here, in this particular situation, we referred this complaint to the Federal Deposit Insurance Corporation for handling.

Q. Why was that?

A. Generally, we do that when the complaint is about a small bank that would be regulated by the FDIC. As I mentioned, the large banks and credit unions -- again, we supervise banks and credit unions with more than 10 billion in total assets.

They're required to respond to the CFPB for complaints.

For smaller banks, community banks, credit unions, we refer their complaints to their federal regulator.  So in this case, it looks like the bank in this complaint was regulated by the FDIC.

Q.  So after that referral, did CFPB take any further action on this compliant?

A.  I'm sorry?  Did the CFPB?

Q.  Did it take any further action on the complaint after making the referral?

A.  No.  We notify the consumer of the referral, and then the FDIC would handle the complaint from there.

Q.  I would like you to focus on the second half of page 1 of Exhibit 415.  What's indicated here?

A.  I'm sorry?

Q.  What is indicated on the second half of the first page that's in front of you?

A.  Here, this would be, again, the primary consumer -- this would be information submitted by the consumer in the complaint.  So, again, it would be the name of the consumer. We ask some questions.  We ask the consumer whether they're a service member or a dependent of a service member.  We ask for email address, phone number, and a mailing address.  And that's what it looks like is on this page here.

MR. KAHL:  Can we turn to the next page of this

exhibit.

BY MR. KAHL:

Q.   What information is provided on the top half of this page? Can you see that?

A.   Yeah.   What we ask is -- during a complaint, we ask consumers to give us some information to help a company find the consumer's records in the system.   So, again, we would have -- in this case the consumer would have given us the account number referenced in the complaint and then a billing address that would have been set up.   And, again, this would be information provided by the consumer during the complaint process.

          MR. KAHL:   Okay.   I would like to focus now on the bottom half of the second page.

A.   You know, I looked at the -- I looked at the bottom half of this when I reviewed the complaint.   The complaint form asked for -- has a space for additional consumer information.   I think the question we have on our website says something like who is involved, additional consumer -- I'm looking at -- when I looked at this and I'm looking at this here, this looks like the name of a banker when I look at -- I see the email address. It looks like the name of a banker, not necessarily a consumer, at face value.   But, again, it has the name, and if you look at the email address, jselby@bankerstrust.com.

BY MR. KAHL:

Q.   This is information that would have been provided by the person making the complaint?

A.   Yes.

MR. KAHL:   Turning now to the next page.  And can we focus in on the top half.

A.   Again, as I mentioned, in the complaint process, what we ask the consumer -- every consumer needs to tell us what product or service they're having the issue with.  We have on the complaint form, then, a list of, okay, well, what is your issue with that product or service, and we ask the consumer to identify the company they're having the problem with.

So, again, here I see the company name, Bankers Trust, and, as we mentioned before, the referral here, that was, you know, after we received the complaint.

BY MR. KAHL:

Q.   And what is the name of the company that's being complained about?

A.   It would be Bankers Trust Company.

Q.   And what was the nature of the issue?

A.   The nature of the issue -- and, again, this would have been identified by the consumer.  We don't verify in the complaint whether the consumer provided the right -- but the issue here said "managing an account, deposits, and withdrawals."

Q.   And would that have been selected from a checklist or a

drop-down menu of some sort?

A.   There is a list on the complaint form that the consumer -- again, I'm not sure how many different issues, but the consumer needs to pick one primary issue.  The consumer can pick one subissue then.  So here you have the primary issue is managing an account; the subissue is deposits and withdrawals.

Q.   And does this indicate it was a problem with a checking account?

A.   Oh, the product, the product.  Checking or savings account, yeah.  And, again, below where it says "checking account," that's the subproduct.

Q.   Does the complaint form also have a place for a narrative explanation of what happened?

A.   Yeah.  That's part of one of the required elements.  We want the consumer to tell us in his or her own voice what happened, what's the nature of the complaint, what's the complaint about, so it's an open text field that we have.

        MR. KAHL:  We can go on to the next page of this document.

BY MR. KAHL:

Q.   Have you had a chance to review this narrative?

A.   I did review the narrative.  And, again, the narrative would have been as submitted by the consumer.

Q.   And what is the consumer indicating here?

A.   From my review of the complaint, again, the consumer seems

to be indicating that there was a deposit with Bankers Trust and the money was not there and the account was closed.  It looks like there's a reference to the Internal Revenue Service here.

And, again, it looks like the consumer is also stating that the company, Bankers Trust Company, wouldn't allow the consumer on the site.  And the consumer is also going a little further and indicating the name of a banker who he has a concern with.

Q.  How much were these deposits for?  Does the narrative indicate that?

A.  Again, the deposits as referenced by the consumer -- it looks like -- it looks like there were two.  The first one is $20,671, and then it looks like the second deposit -- and, again, I can't tell if there's a typo there, but I'm thinking that means $10,921 and no cents.

But, again, it looks like there might be a typo in there. I can't see the way the complaint -- again, it might have been just entered by the consumer if you look at the way it reads and what happened.

Q.  Does the way it reads indicate $10,921,192?

A.  Okay.  Yep.  I'm sorry.  Yep.  Yep.  I've got it.  Thank you.

Q.  And --

A.  Yeah.  It looks like $10,921,192.  I didn't see that comma there when I first looked at it.

Q.  Okay.  And, finally, there's a section at the bottom -- if we could focus in on that -- marked "Desired Resolution."

A.  That would be what the consumer wants to happen out of the complaint process.  Again, we ask what do you want the bank or financial company to do, and, again, it looks like the consumer here wants the check for the remaining balance, and they're indicating that there was nothing wrong with the check.

He's asking the company to reach out to some business contacts, and it looks like there's also a request to file charges against employees relative to the allegation of taking the funds.

Q.  And does this specifically include an assertion, quote, I know there was nothing wrong with my Treasury check?

A.  Again, this would be what the consumer said.  "I know there was nothing wrong with my Treasury check."

Q.  And that comes from the person submitting the form, not from your agency?

A.  I'm sorry?

Q.  That comes from the person submitting the form?

A.  Oh, absolutely.  Yeah, it is identically as submitted.  We don't make any changes to either of those fields.

MR. KAHL:  I have no further questions on direct examination, Your Honor.

THE COURT:  Thank you.

Cross-examination, Mr. Kock?

CROSS-EXAMINATION

BY MR. KOCK:

Q.  Good morning, Mr. Steckel.  Thank you for being here.

        THE COURT:  Before you start --

        Mr. Steckel, would it assist you to have an
amplification device for the sound in the courtroom?

        THE WITNESS:  Yeah, that might help a little bit.

        THE COURT:  Thank you.

        THE WITNESS:  Thank you.

        THE COURT:  Mr. Steckel, does that help you?

        THE WITNESS:  Much better.

        THE COURT:  Thank you.

        Mr. Kock, you may ask your questions.

        MR. KOCK:  Okay.  Thank you.

BY MR. KOCK:

Q.  Mr. Steckel, in your position with the Consumer Financial
Protection Board, does that mean you're familiar with the Fair
Debt Collection Procedures [*sic*] Act?

A.  A little bit.  I'm not a regulatory expert, nor am I an
attorney.  I'm a complaint process specialist.

Q.  Okay.

A.  So I am familiar with the law in general, but I wouldn't be
able to interpret it legally.

Q.  Oh, okay.  Okay.  How about the Truth in Lending Act?

A.  Again, same thing again.  Generally familiar with that as

an employee of the Bureau and through my work, but, again, not an expert that can provide regulatory advice.

Q. Okay. And I'm going to guess that includes the Fair Credit Reporting Act too?

A. Correct.

Q. What is the definition of a creditor, according to the -- your agency that you work for?

A. Again, I'm not in a position where I could give, you know, specific -- I'm a complaint process --

Q. Okay.

A. -- specialist for that. So, again, as far as regulatory definitions, that would be outside of my area of expertise.

Q. I gotcha. And you did state that Jeffrey Allan Kock was a consumer; correct?

A. According to the complaint that I looked at, yes.

Q. Okay. And it looked like he was victimized; correct?

A. Again, we didn't -- we don't make any -- I don't make any judgment on, you know, the merits of an individual complaint per se.

This was a complaint that -- you know, as I mentioned, we receive the complaint, we review it for completeness, and we handle the process there. There was an allegation in this consumer's complaint.

Q. And a complaint is just that; correct?

A. The complaint -- I'm sorry?

Q.   And a complaint means?

A.   The consumer complaint that was submitted.

Q.   Okay.

A.   And, again, you know, there were allegations made by the consumer in that complaint, and, again, we don't verify whether or not the allegations made by a consumer are, in fact, true or not.

MR. KOCK:  Okay.  No further questions, Your Honor.

Thank you, Mr. Steckel.

THE COURT:  Thank you.

Redirect examination for this witness?

MR. KAHL:  No.  Thank you, Your Honor.

THE COURT:  Thank you.

Mr. Steckel, you may step down.  You may hand the amplification device to Ms. Sands.  Thank you.

Any additional evidence on behalf of the United States?

MR. KAHL:  No, Your Honor.  At this point the United States rests.

THE COURT:  Thank you.

Members of the jury, the Government has indicated that they have concluded their evidentiary portion of this proceeding.  We are going to take a brief morning recess here now.

It is 9:36.  I will ask you to be back and prepared to

come into the courtroom at ten till ten, so 9:50.  If our recess will be any longer than that, I'll make sure that someone makes you aware of that.

Please continue to remember the admonition of the Court.  We'll be in recess.

(Jury exited the courtroom at 9:37 a.m.)

THE COURT:  Thank you.  You may be seated.

We're outside the presence of the jury.

In reviewing the exhibits that were originally proposed and then admitted through the course of this proceeding, by my record, the only two proposed Government's Exhibits that were not admitted were Government's Exhibits 301 and 611.

Do you agree with that Mr. Kahl?

MR. KAHL:  I believe there was one photograph that was not offered -- or was not admitted, 417.

THE COURT:  I think it was eventually admitted.  It wasn't admitted in the original batch, but I have it down as admitted.

Ms. Sands, can you confirm that?

COURTROOM DEPUTY:  Yes, I do too.

THE COURT:  So I have that as being admitted.

MR. KAHL:  Okay.

THE COURT:  Mr. Kock, do you agree that Exhibits 301 and 611 were not admitted?

THE DEFENDANT:  Absolutely.  Thank you.

THE COURT:  Okay.  So we will need to ensure that those exhibits are not included on the electronic submission. I also note that our records indicate that the Government did not provide the electronic versions of some of the exhibits admitted today:  616, 617, and 618.  So we'll need to make sure that those are in the JERS system and in the hard copy binder that will go back with the jury, although I don't know that you've used a hard copy during the course of trial.

Was it the Government's intent, consistent with our discussion at the final pretrial conference, to rely exclusively on the electronic versions and then just the hard copy versions that were admitted for those physical exhibits?

MR. KAHL:  That would be fine.  We have hard copies available.  They are not in a binder.  They are in file folders.

THE COURT:  No.  I have -- during COVID, I have vacillated between different ways to do it.  Our electronic jury management system is very easy to use.  I have at various points during COVID exclusively used that.  At other times I have allowed there to be both physical exhibits that match along with the electronic exhibits.

Based upon the nature of this evidence, I think it would be sufficient for the exhibits that were admitted in hard copy to be provided to the jury and then otherwise rely upon

the electronic version.

I will ask for the Government to print out and the defense to confirm a printed out listing of what the exhibits are consistent with the electronically admitted exhibits. Jurors have expressed that that is helpful to them to have that in hard copy, so, basically a table of contents that tells them what the exhibits are that they have access to.

MR. KAHL:  That would be fine, and we can provide that --

THE COURT:  Thank you.

MR. KAHL:  -- to the Court.

THE COURT:  Mr. Kock, anything that you need to -- any motions or any other matters you need to bring to my attention at this time?

THE DEFENDANT:  Yes.  Just one second here.

Yes.  I move for judgment of acquittal on each count because the Government has failed to meet its burden of proof on each element of each offense charged.

THE COURT:  Thank you, Mr. Kock.

Any additional argument in that regard?

THE DEFENDANT:  No, Your Honor.

THE COURT:  Mr. Kahl, would you like to respond?

MR. KAHL:  The United States would rely on the record already made.

THE COURT:  Thank you.

So a Rule 29 motion for a judgment of acquittal made before submission to the jury requires the Court to consider the evidence presented in the light most favorable to the prosecution and to presume that if there is any conflict on the record that the trier of fact resolves that in favor of the prosecution.

The question for the Court under Rule 29 and under *Jackson v. Virginia* and its progeny is whether any rational trier of fact can find the essential elements of each of the crimes charged beyond a reasonable doubt.

In this case we have 13 separate counts.  The elements of each are outlined, as agreed to by the parties, in the final jury instructions.

The Court has heard the evidence presented and finds that each count has had each element presented evidence on sufficient for a reasonable jury to find the defendant guilty beyond a reasonable doubt.

And, for that reason, the motion for judgment of acquittal is denied.

Any additional record in that regard from the Government?

MR. KAHL:  No, Your Honor.

THE COURT:  From the defense?

THE DEFENDANT:  No, Your Honor.

THE COURT:  Okay.  With that record, Mr. Kock, you

indicated at the start of the day that it was your intent not to testify.  That remains your decision?

THE DEFENDANT:  Correct.

THE COURT:  And you have no other witnesses that you're calling?

THE DEFENDANT:  No, I don't.

THE COURT:  So after this recess, we will bring the jury in.  We will begin the reading of the final jury instructions.  I'll simply say to the jury, "That concludes the evidentiary record before the Court," I will read the final jury instructions, and then the parties will present their closing arguments.

Any objection to proceeding in that way from the Government?

MR. KAHL:  No, Your Honor.

THE COURT:  From the defense?

THE DEFENDANT:  Do you mind if I rest my case in front of the jury?

THE COURT:  You certainly can.  I always defer to the defendant's preference.  I can ask you if you wish to present any evidence, and you can say, no, you do not, and that's at your choice.  Would you like me to address you?

Because you don't have the burden of producing any evidence, you don't have to do that, but I'm also happy to have you say, "I do not present any evidence."  It's whatever you

would like.

THE DEFENDANT:  I'm okay with that.

THE COURT:  So you would like me to direct a question to you?  I'll say, "Mr. Kock, do you have any evidence you would like to present on behalf of the defense?"  And then you'll simply say "no."

THE DEFENDANT:  No.  Yeah.

THE COURT:  Okay.  And any objection to proceeding directly into the final instructions and the closing arguments as we've indicated?

THE DEFENDANT:  Could we take a short recess before the closing arguments?

THE COURT:  No.  I mean, we're recessing now, and the recess now will be -- it doesn't take that long to read final instructions, so the recess now will be the recess before closing arguments.

THE DEFENDANT:  Okay.

THE COURT:  Does that make sense to you?

THE DEFENDANT:  No, but I'll go with it, though.

THE COURT:  Okay.  We're going to break now.  It is 9:45.  We can take until -- I can tell the jury that we will be delayed somewhat.  We can take until 10:00 or 10:05 if you would like, Mr. Kock.

THE DEFENDANT:  Yes.  Thank you.

THE COURT:  So I will tell the jury that it will be

10:05 before we begin, and then we'll begin with closing arguments.

I would like to make a record with regard to the alternates in this case.  You'll recall that we selected two alternates to serve in this case.  It has been my practice during COVID to retain the alternates during deliberations in case there is some issue during deliberation, consistent with Rule 29 of the Federal Rules of Criminal Procedure.

Any objection to retaining the alternates?

MR. KAHL:  No, Your Honor.

THE DEFENDANT:  No, Your Honor.

THE COURT:  And by my record, the alternates were Juror No. 34 and Juror No. 35.

Do you agree with that, Mr. Kahl?

MR. KAHL:  Yes, Your Honor.

THE COURT:  Mr. Kock?

THE DEFENDANT:  Yes.  Yes, Your Honor.

THE COURT:  Okay.  So we'll make that record after closing arguments.

All right.  Anything further on behalf of the Government at this time?

MR. KAHL:  No.  Thank you, Your Honor.

THE COURT:  On behalf of the defense?

THE DEFENDANT:  No, Your Honor.

THE COURT:  I'll ask for everyone to be prepared to

proceed at 10:05.  We'll be in recess.

(Recess taken at 9:47 a.m. until 10:10 a.m.)

(In open court, with the defendant present, outside the presence of the jury.)

THE COURT:  Thank you.  Please be seated.

We're back on the record outside the presence of the jury in the matter of the United States of America versus Jeffrey Allan Kock.

Anything the Government needs to bring to my attention at this time?

MR. KAHL:  No, Your Honor.

THE COURT:  The defense?

THE DEFENDANT:  No, Your Honor.

THE COURT:  All right.  The final instructions have been distributed to the jurors' chairs.  We'll bring in the jury at this time.

(Jury entered the courtroom at 10:12 a.m.)

THE COURT:  Thank you.  You may be seated.

We're back on the record in the presence of the jury in the matter of the United States of America versus Jeffrey Allan Kock, 4:21-cr-54.

Mr. Kock, any evidence on behalf of the defense?

MR. KOCK:  The defense rests.

THE COURT:  Thank you, sir.

Members of the jury, that concludes the evidentiary

portion of our proceedings.  At this time I am going to read to you the final instructions.  After jury instructions, as you'll recall from my outline of trial, you'll hear the closing arguments of the parties.  You have received a copy of the final jury instructions.  You can follow along with those as I read them to you.

As you recall from preliminary jury instructions, the court reporter will not be reporting this portion of the proceeding because the jury instructions themselves will be filed in the record of the court.

Thank you for your attention to the reading of the final jury instructions.

(The Court read the final jury instructions.)

THE COURT:  You will see attached to those final jury instructions is the verdict form, and the verdict form lists all 13 counts with indications to mark by way of an "X" of not guilty or guilty for each count.

Thank you for your attention to the reading of the final jury instructions.

At this time the parties will present their closing arguments.  Counsel for the Government will have the opening argument.  The defendant will then have the opportunity to respond to the Government's argument and make his own defense argument.  Counsel for the Government will then have the opportunity to reply to the defense argument.

The parties will be summarizing the testimony you have heard and the evidence presented during the trial.  They will be recalling the evidence as you will later when you retire to deliberate.  They will not try to mislead you, and if their recollection of the testimony is not the same as yours, you must follow and reply upon your own recollection.

Closing arguments are not evidence, and they should not be treated by you to be evidence.  Likewise, any comments on the law are not instructions on the law.  I have just given you the law you are to apply in this case.

Thank you for giving the closing arguments your careful attention.  Because there has been evidence admitted and to help you recollect that evidence when you retire, you are allowed to take notes during this portion of the proceeding.  I remind you again, however, that neither the arguments made or your notes are evidence.  Thank you.

On behalf of the United States.

MR. KAHL:  Thank you, Your Honor.

I owe taxes; I don't pay taxes; it's just a game of Monopoly.  That's what Mr. Kock told Mr. Hadzic at Bankers Trust.

Well, folks, this isn't a game of Monopoly.  This is a federal criminal trial, and this is a federal criminal case where the evidence shows that the defendant, Jeffrey Allan Kock, committed all 13 crimes alleged in the indictment.

At this point I will go through those counts with you and go through the evidence with you, and at the end, we'll ask you to return verdicts of guilty based on the evidence.

We'll start with Counts 1 through 5. Those are the failure to file counts for the calendar years 2014 through 2018.

THE COURT: Mr. Kahl, I hate to interrupt, but if you could please make sure you speak directly into the microphone. You can raise the podium or you can lean forward.

MR. KAHL: I'll try both.

THE COURT: Thank you.

MR. KAHL: So moving on to Counts 1 through 5, you'll recall that the testimony and evidence and documents indicated that the defendant worked for a number of employers during the years 2014 through 2018. He worked for Shottenkirk Chevrolet out in Waukee. He worked at a number of restaurants and bars in the Des Moines metro. He even received unemployment benefits from the Iowa Workforce Development.

To demonstrate his employment and his income, you've seen and will have in the jury room with you access to his payroll records, the W-2 forms that the employers sent out at the beginning of each year for the previous calendar year.

You've had a chance to see -- and Special Agent Eklov testified about -- the IRS records of income -- those are Exhibits 101 through 105 -- as well as the income records from

Iowa Workforce Development at Exhibit 107.

As the judge has told you in her instructions, a single person under the age of 65 was required to file an income tax return if that person had gross income in excess of the amounts stated on this slide, which is between roughly $10,000 per year. $10,150 in 2014, for example, and up to $12,000 for the calendar year 2018. And the evidence you've seen in this trial shows that the defendant, Jeffrey Allan Kock, had and received gross income in excess of those amounts.

We're looking here at part of Exhibit 601. You'll recall from Special Agent Eklov's testimony that based on the exhibits, based both on the IRS records and then going back and looking at the employer records and the Iowa Workforce Development records, he was able to compute the amount of gross income the defendant received each year.

So, for example, here in 2014, the evidence showed gross income in excess of $29,000, which was in excess of that $10,150 filing requirement that was applicable for that year.

For 2015 the evidence shows the defendant was working for Buzzard Billy's and Louie's Wine Dive as well as the Hessen Haus, that his income again exceeded the filing requirement. It exceeded $24,000.

In 2016 Defendant's employment mostly was with Hessen Haus. $22,500. Again, exceeding that filing requirement.

Finally, for 2017 and 2018, which are both displayed

on this slide, the defendant received income from a couple of different employers, including mostly from Doc's Lounge during the latter half of 2017 and all of 2018.  You heard the testimony from Mary Ann Lee, for example, and she authenticated the documents and the payroll records from Doc's Lounge.

So, again, the defendant had and received gross income greater than that filing requirement that was -- for example, for 2018 it was $12,000.  His gross income was $28,000, a little bit in excess of that.

As the judge has told you and as Special Agent Eklov explained in his testimony, returns are usually due on April 15 of the following year except when April 15 falls on a weekend or holiday, and in those years, the filing date is a day or two thereafter; for example, April 18, 2016, with regard to the 2015 return.

And this chart, Exhibit 602, which you'll have with you in your deliberations, summarizes the defendant's wages for each of those five years and contrasts it with the minimum filing requirement that Special Agent Eklov explained to you.

Next, there is no evidence that the defendant filed returns for any of these years.  In fact, Ms. Sharrah from the Kansas City Service Center testified that she had reviewed the IRS's computer records, found no evidence of a return for any of those years.  The defendant hadn't filed a return since 2009.  You also will have you with in the jury room Exhibit

223, which is a certification of lack of record as to any income tax returns for this defendant for those years.

Willfulness.  As the judge explained to you, the Government is required to establish the defendant knew that the law required him to file and that he deliberately chose to violate that law.

What evidence shows that?  Well, again, you can consider all of the evidence in the case.  You can consider, for example, the fact that up until 2008, the defendant filed returns and received refunds on an annual basis.  You have those transcripts of account in evidence as Exhibits 201 through 222.

You will see thereafter, and after he apparently had some audit problems with the IRS, the defendant stopped filing income tax returns, that he hasn't filed a return since 2009, that he specifically didn't file returns for 2014 through 2018, which are the years that you are considering in your deliberations.

The defendant received those forms, W-2s, in January of each year.  They would have been mailed to him by his various employers.  You saw those W-2s in evidence.  Again, you'll have those in the jury room with you.  Those, again, indicated to the defendant that -- or should have indicated to him a reminder to file returns.

Finally, back to the statement I referenced at the

beginning of my opening. The defendant told Mr. Hadzic that he owed taxes, that he didn't pay taxes, that he characterized it as some sort of game of Monopoly. Again, that evidence tells you this defendant well knew he was required to file returns and was deliberately choosing not to file returns.

I want to move next to the false claim counts, Counts 6 and 7, of the indictment. Those counts each allege that the defendant requested a refund -- made a claim for a tax refund, which, as the judge has instructed you, is a claim against the United States, and the allegation and the evidence shows that those were false, fictitious, or fraudulent.

The first false claim is the $20,671 refund request requested on the 2018 Form 1041 for the calendar year 2018. You'll have that exhibit with you as Exhibit 302. You will recall that that was an electronically filed return.

That return claimed income in excess of $23,000 but then claimed withholding in the exact same amount and requested that refund of $20,671 to which the defendant was not entitled.

You will recall the testimony that the return says this was withheld, and Ms. Sharrah testified there was no evidence of withholding for that trust for the calendar year 2018 or for any of the relevant calendar years, 2011 up until the present.

The next count relates to the 2019 Form 1041. That's the false claim for a tax refund in the amount of $10,921,192.

You will recall that the front page of this return in the center of it has a red stamp on it indicating that it was received by the Ogden Service Center on January 24 of 2020. This paper return has the defendant's signature on it and is dated January 16, 2020.

So the evidence -- why do we know that these -- or why does the evidence show that these returns were false, fictitious, or fraudulent? Well, you will recall the testimony and you will recall looking at the documents -- and you'll have the returns with you in evidence -- that each of these returns claims huge amounts of withholding; withholding that, in fact, for the 2018 return is exactly the same as the amount of income claimed and on the 2019 return is within $2 of that.

That doesn't make any sense, as Mr. Roginsky explained, and, again, as Ms. Sharrah testified, the IRS has no record of any withholding for that trust for the years in question. Accordingly, the evidence shows that those returns were false, the claim for refund was fraudulently made, and that the defendant knew it.

I'm going to talk a little bit about some of the elements for Counts 6 and 7. The defendant prepared and filed these forms. There's no question that the defendant was responsible for these Forms 1041. He received the refund checks in connection with each of them, he deposited them, he made complaints to various agencies that his money and his

checks had been taken away from him.

Using reason and common sense, it is clear that the defendant filed these forms and that he knew that they were false, fictitious, or fraudulent.

One of the other elements of these counts is the element of materiality.  Did the false representation affect the actions of the IRS?  Well, here, yes, they did because it caused the IRS to issue these refunds to which neither the defendant nor his trust were entitled.

I should point out as well, as indicated on this slide, while the IRS does not -- the IRS need not have been actually deceived by the false representation, but, by the same token, it is not required that the IRS had better tried to protect the fraud.

We're here because of what the defendant, Mr. Kock, did.  We're not here because of what the IRS did or didn't do after he committed those crimes by submitting the false claims.

I'm going to talk a little bit more about the 2018 return.  This is Count 6.  Again, this was an electronically filed return.

I think Ms. Sharrah testified it would have been received either by the service centers in Ogden or Austin, so it would have been electronically filed from here in the Southern District of Iowa to one of those out-of-state service centers.

This was based -- this claim for refund in the amount of $20,671 was based on the defendant's self-reported claim that he or his trust were entitled to that refund.

Recalling Exhibit 303 -- this is the portion of that electronic submission tree that Ms. Sharrah testified about -- third line from the bottom is the time stamp indicating that that return was electronically filed on November 23 of 2019.

Moving on to Exhibit 304.  This is the 2019 return that claims that refund of nearly $11 million.  You will recall again that this return, signed by the defendant, Jeffrey Allan Kock, was received by the Ogden Service Center on January 24 of 2020, and it was submitted to the IRS -- or it is dated on the signature line January 16.

You also will have, as part of that original exhibit, the original mailing envelope indicating that that return and establishing that that return was mailed from the Southern District of Iowa using this defendant's return address to the Internal Revenue Service at Ogden, Utah.

I have been talking about these two forms principally in the context of the false claims in Counts 6 and 7.  The same conduct is alleged as wire fraud and mail fraud in Count 8 and Count 9.

I'll start with Count 8.  This is the electronically filed 2018 Form 1041 requesting the $20,671 refund.  The evidence shows that this defendant, Jeffrey Allan Kock, engaged

in a scheme to defraud the Internal Revenue Service, that he acted with the intent to defraud the Internal Revenue Service in submitting that claim for refund, and specifically that the scheme that he executed included or involved an interstate wire; that is, the electronic submission of that tax return.

Likewise, we see the same scheme to defraud in Count 9 as to the mail fraud count.  That's the almost $11 million false claim for refund where, again, the defendant was intending to defraud the Internal Revenue Service, intending to bring about to himself a financial gain to which he well knew he was not entitled.

The difference between wire fraud and mail fraud is that here, as an essential step in the scheme, the mails were used; that is, that hard copy form, Exhibit 304, was mailed from the Southern District of Iowa to the Internal Revenue Service.

I want to talk about intent to defraud, which relates to both of those counts, in a little bit more detail.  Again, the evidence needs to establish, the evidence does establish, that the defendant acted knowingly, that the defendant knew what he was doing when he submitted these false claims to the Internal Revenue Service.

Here the evidence shows that he was trying to obtain an unlawful financial gain to himself by essentially making up a bunch of numbers, putting them on a form, claiming

withholding that didn't happen, and saying he was entitled to a refund.

Again, the IRS's failure to detect that scheme prior to the issuance of the refund has no relevance to the charge. That has to do with what happened after the crime was committed after the mail fraud or wire fraud schemes were consummated.

Let's talk a little bit more about where the money went in this case. You will recall the IRS refund checks that we've seen, we've looked at bank statements, and you will have those available to you during your deliberations, and we have had the cashier's checks for the purchase of the Mercedes-Benz vehicles.

You'll recall that Ms. Serdarevic testified that the defendant opened an account at Bankers Trust on December 30 of 2019, and Exhibit 401 you have displays part of the account opening documents. The defendant opened that account in the name of the Jeffrey Allan Kock Living Trust, but, make no mistake, it was the defendant who opened that account.

You see his signature on the bottom of that same exhibit, and there is no question but that the defendant used the first Treasury check -- and this is Exhibit 408. You'll have that original Treasury check with you during your deliberations. There's no question that this original Treasury check in the amount of $20,671 was the deposit used to open that account.

Ms. Serdarevic explained that to you in her testimony. In fact, as demonstrated here by Exhibit 410, you have photographs from the bank surveillance cameras of the defendant opening that account and making that deposit of $20,671 based on that fraudulent refund.  Likewise, the check for $10,921,192 was deposited by this defendant into that account.

And just as an aside, there was some mention made of the fact that the Treasury checks do not have a signed endorsement on the back of them.  That doesn't matter.  The evidence shows that this defendant presented these checks to the Bankers Trust and that these checks were deposited into his trust account.

And, again, looking at Exhibit 603 as an example, we have a photograph of the defendant, Jeffrey Allan Kock, presenting that fraudulently obtained refund check to Ms. Serdarevic for deposit into that account.

You'll recall that those were deposited -- or that the banking occurred on a Saturday; Saturday, February 29; that the check was actually processed on Monday, March 2, the next business day, with the funds being available the business day thereafter; that is, Tuesday, March 3.  And that will become important here in a moment.

But what was the first thing the defendant did with this money?  Well, he bought some cars.  He didn't buy just any cars.  He bought three of the most expensive vehicles in

central Iowa:  A 2020 E63 sedan, a 2017 G63 SUV -- that's the vehicle that we referred to as a G-Wagen -- and a 2019 SL450 coupe, all three being Mercedes-Benz vehicles that retail for well north of $100,000.  In fact, starting with the sedan, that purchase was for $146,271.80.

The defendant went to the Mercedes dealership -- and you'll see if you look at Exhibit 508, which is the purchase agreement for this E63 sedan, the date of that transaction -- I'm looking at the bottom half where the defendant signed and dated -- that transaction occurred on February 29; that is to say the same date that he went to the bank he immediately was at the dealership purchasing not one but two Mercedes-Benz vehicles.

He also purchased the SUV, the so-called G-Wagen, for $122,556.05.  And, again, you'll have the photographs available to you, you'll have the purchase agreement here for the SUV as Exhibit 605 -- I'm sorry -- as Exhibit 502, and that, again, is signed by the defendant, Jeffrey Allan Kock.

I want to take a little bit of a detour here because something else happened on January 29 [*sic*].  You will recall Mr. Gladney's testimony from the Mercedes dealership that the defendant was then off to buy a house, and you heard this morning testimony about that by Mr. York, the realtor from Remax.

He explained to you the $75,000 check, which was

payable on March 1 -- made out on March 1 -- it would have been that Sunday -- where the defendant was trying to purchase this very nice multimillion-dollar residence out by Saylorville Lake.  And as Mr. York indicated to you, the defendant had been in communication with him as early as January, which is going to be about the same time that that larger fraudulent refund claim was made for more than $10 million.

Now, that shows you that this defendant was being calculating and clear in what he was intending to do, that he was intending to steal that money from the Internal Revenue Service and purchase a nice residence for himself as well as these vehicles.

The cashier's checks -- and I mentioned the dates. Now this gets us to Tuesday, March 3.  These are the two cashier's checks -- Exhibit 504, these are the copies of the fronts of the original cashier's checks signed by the bank officials that were presented to the Mercedes-Benz dealership.

As Ms. Selby indicated to you in her testimony, these funds were debited from Defendant's -- or the trust bank account.  You'll have that before you as Exhibit 404.  The two checks were debited from the account as a single entry for $268,827.85.

If you look at the bank copies of those exhibits, which are Exhibits 607 and 608, you will see on the back of them -- and I think we went through this, I believe, with

Ms. Selby -- verifying that those funds came out of this defendant's account at Bankers Trust.

The next day, March 4, the defendant arrived at the Mercedes dealership with his mother and bought yet another vehicle. This is the SL450 coupe which was purchased for $117,581.70. Again, you'll have -- again, you'll have the purchase agreement indicating the defendant's email address is within the contact information and that the purchase agreement being signed by the defendant's mother, Susan Kock.

Again, you have the bank copy, Exhibit 609, of the cashier's check, and, again, you will see that debited from the defendant's account in Exhibit 404.

Sort of as an aside, several days later on March 10, after the bank attempted without success to basically recall these checks, the bank issued a substitute instrument, Exhibit 610, to the Mercedes-Benz dealership.

That, however, really has no bearing on the defendant's conduct. That was something between the bank and the Mercedes-Benz dealership. These three cashier's checks were purchased and negotiated by the defendant on March 3 and March 4, and the funds came out of his account on those dates.

This is all a lead-up to some discussion of Counts 10, 11, and 12. These are the money laundering counts. These allege that the defendant knowingly engaged in monetary transactions; that is, by negotiating those checks with Bankers

Trust, it is alleged and is an element of that offense that the amount of the monetary transaction be more than $10,000.  And, again, these are six-figure checks for the purchase of the vehicles.

The defendant -- more than $10,000 had to be derived from either the mail fraud or wire fraud counts which the judge has talked to you about is in Counts 6 -- Counts 8 and 9 of the indictment.  The defendant didn't have to know that these were proceeds of mail fraud or wire fraud necessarily, but the defendant did have to understand -- and the evidence shows you that he did understand -- that these were from the result of a criminal offense; that is, those fraudulent claims he submitted to the Internal Revenue Service.

It is required that the transactions occur within the United States, which they did -- they were out the Mercedes dealership and the Clive branch of the Bankers Trust -- and that the transaction, to some degree, affected interstate commerce.  And, again, you have evidence that Bankers Trust, for example, is insured by the FDIC, that the vehicles in question certainly were not manufactured in the state of Iowa.

This takes us next to Count 13.  That's the concealment of the asset.  You'll recall from Special Agent Eklov's testimony yesterday that a federal magistrate judge issued seizure warrants for the three vehicles, giving the IRS agents authority to seize them.

As to the sedan, when the IRS agents and Agent Eklov encountered the defendant and provided him with a copy of that seizure warrant, the defendant said that he hid the vehicle. It was not recovered until September of that year and only after another court hearing and a specific order from another federal judge.

I want to focus in on something that was mentioned about this exhibit yesterday. You will see that there is a typo. There is an obvious typo. Date and time issued, June 16, 3020. The testimony was that that was obtained on June 16, 2020, as verified by the fact that it was filed by the clerk's office the next morning on June 17, 2020.

And there's no question that the defendant was provided with a copy of that seizure warrant, was notified that there was a seizure warrant for that vehicle.

And if there's any question what he knew, take a look at Exhibit 518. That's the letter he sent to Special Agent Whitten. That's that forfeiture agent who testified yesterday where the defendant demands that the other two vehicles, the coupe and the G-Wagen, be returned to him clean and full of premium gas, and he specifically asks that the seizure warrant for the sedan be lifted.

So, again, that's showing you beyond a reasonable doubt that this defendant knew there was a valid seizure warrant for that vehicle and deliberately hid and concealed

that vehicle.

I'm going to leave you with Exhibit 418.  418 is from the bank surveillance cameras back on February 29.  That is before Bankers Trust froze the account and returned the money to the IRS.  This is before the transactions to purchase the real estate fell through.

This is where the defendant was on his way to the Mercedes dealer and then on his way to buy a mansion with the money that he had stolen from the Internal Revenue Service. This is the look of somebody who thought he had gotten away with something.

Based on the evidence presented in this trial, the defendant should not get away with this conduct.  Your verdicts, based on the evidence and based on the law given to you, should be guilty as to each and every one of those counts.

I will have a chance to speak to you again in rebuttal, as the judge indicated.  At this time Mr. Kock has the opportunity to tell you what he thinks the evidence in this trial showed.

THE COURT:  Thank you, Mr. Kahl.

Members of the jury, you can stand and stretch if you would like.  I certainly will.

Thank you.  You may be seated.

Mr. Kock, are you prepared to proceed?

MR. KOCK:  Yes, Your Honor.

THE COURT:  Thank you.

MR. KOCK:  Ladies and gentlemen, thank you for being here.

You know, I'm Jeff.  I am a man before the court, and I'm not a legal expert, I'm not an attorney.  You know this.  I don't know legalese language, I don't know the legal customs, and you saw me get in trouble a few times for making mistakes with the rules of procedure.  As I did not choose to have an attorney represent me, I just had to -- I had the assistance of counsel from Ms. Nash, and I'm very fortunate for it.  She did help, and I'm very appreciative of her.

I want to say again:  What is the purpose of Government?  And I am going to read the second paragraph of the *Declaration of Independence*, and I believe I read that to you the first time in my opening statement.

MR. KAHL:  Objection.  That's not in evidence.

THE COURT:  It was stated during openings without objection.  The defendant will be allowed to restate the same language he stated in opening statement.

MR. KOCK:  Thank you, Your Honor.

THE COURT:  The objection is overruled.

Mr. Kock, I'll remind you to please speak slowly.

MR. KOCK:  I'm sorry?

THE COURT:  I'll remind you to please speak slowly.

MR. KOCK:  Oh, of course.  Forgive me.

THE COURT:  Thank you.

MR. KOCK:  The second paragraph of the *Declaration of Independence*:  We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable rights, that among these are life, liberty, and the pursuit of happiness -- that to secure these rights, governments are instituted among men, deriving their just powers from the consent of the governed.

Now, that means the government exists to secure rights, and it's a self-evident right that all men are created equal.  And as I stated in the opening statement, of course, men and women are synonymous, are genderless, for purposes of this case.

And, again, I'm going to read it one more time.  We hold these truths to be self-evident -- truths -- that all men are created equal, that they are endowed by their Creator with certain unalienable rights -- meaning that you can't lien them -- that among these are life, liberty, and the pursuit of happiness.

And think to yourself what that means, that to secure these three rights of life, liberty, and the pursuit of happiness, governments are instituted among men, deriving their just powers from the consent of the governed.

Okay.  What does that mean additionally?  It means that all prosecutions are valid.  Okay?  We have the right to

face our accuser.  If someone has wronged us, that is the purpose of government, to secure these rights.

If someone else has infringed -- another man has infringed on the rights of life, liberty, and pursuit of happiness on another man, we have government, pursuant to the *Declaration of Independence*.  And I believe this Court has stated that they are government and they are under the *Declaration of Independence*.

As I said, I'm a man before this court.  I'm also a member of the Kingdom of Heaven, and I believe God's love comes first.  I have asked to face my accuser in this case, yet no man has pointed at me and said, "That's the man.  He did it. He owes me."  I fail to see it.

Ladies and gentlemen of the jury, you must find me innocent of everything.  The fact is that no man, woman, or child has accused me of any crime, and I have not interfered with the life, liberty, or the pursuit of happiness of any man, woman, or child.  Not to say that any errors haven't happened. It certainly appears that there may be a couple errors.

I want you to think about the Supreme Court for a moment.  There are nine members, and these are some very intelligent people.  The frequency of times that they unanimously agree on a case is very infrequent compared to the amount of times that they have variously split decisions.

And what's that tell you?  It tells me that it's

opinion based.  They choose.  They make choices individually, and they come together as a group.  They make their own choices.

They're looking for a unanimous decision from you all. I just need one of you to go my way on each count and see things from a different perspective possibly, or your own perspective.  I have the confidence that I'll get that.  And, again, I'm here to do the right thing:  Face my accuser and provide remedy.

Here's what you didn't see or hear in the last few days.  The Government has the burden of proving each and every element of each offense charged.  They have failed to carry that burden, and, for that reason, you should find me not guilty.

The Government -- I found it funny -- or very interesting, rather, the Government had no laws or codes listed or explained inside of evidence --

MR. KAHL:  Objection, Your Honor.

THE COURT:  Sustained.

As the jury has been instructed, the Court provides you with the instructions on the law that you are to provide in this case -- you are to apply in this case.

You may continue your argument as to the evidence presented.

MR. KOCK:  Okay.  Thank you.

Again, the Government failed to produce an injured party. How can there be a verdict on anything with no injured party? There cannot be. No man was harmed, injured, or damaged from any of the actions. Did any man, woman, or child claim in court where relief could be granted? No.

Did any one person stand in front of me and accuse me of intentional failure to file and then prove it with actual codes and regulations on the record? Did you see any actual code -- I just got overruled on that.

Bankers Trust was not injured. Were the owners of Bankers Trust here? I don't believe so. There were just employees here. I don't believe any of their paychecks were harmed. I didn't hurt a single one of them. If they -- and if the owners of Bankers Trust feel that I have caused them any injury, damage, or harm, let them sue me in their own name, come find me for remedy.

And that goes for the Government too. I still haven't gotten a bill -- or excuse me. I -- actually, I retract that.

Let's see here. The fact is that the Government bears the burden of proof on all counts. The Government has failed to prove intent on any single count of the case, let alone all the counts.

Regarding Counts 1 through 5, what does "willful" mean? It means intentional or deliberate. Again, nobody pointed at me accusing me of intentionally or deliberately

avoiding taxes -- paying taxes.  Excuse me.

There is -- Mr. Kahl suggested you consider the W-2s might have served as an indication that I needed to file taxes. But, first, the Government offered no proof that I actually received the W-2s; and, second, if you were to assume I received the W-2s, there are W-2s listing income below the filing requirement amount.  That is evidence of proof of nothing at all.

You witnessed two 1041 tax returns that were submitted with taxes taken out of the return, proving that I do have a record of paying taxes.  One of those was about 4.1 million in taxes, and I felt really good about doing that as a service to the country.

None of the payroll witnesses accused me of a crime either.  If you -- they only pointed at me to identify me, not to say, "That's the man.  He owes me."  Again, you're allowed to face your accuser.

Neither did they even prove a crime had been committed.  Think about it.  Every payroll witness only provided basic employee information.  No accusations or proof of a crime came from any of them in their testimony.

In fact, the Government -- or did the Government produce any laws that show clear and concise instructions that actually showed dates you must pay for by else [*sic*]?  I don't believe they did.  There was nothing in evidence, just some

personally generated spreadsheets.

There is no evidence that I knew the amount of income that triggered a requirement to file tax returns in 2014, 2015, 2016, 2017, or 2018 exists.

We heard Special Agent Todd Eklov from the Treasury. Did he provide proof of their codes and state where the legal right is for them to ask for information for any tax we are liable for, their actual regulations, or what must be filed by specific and certain dates?  I didn't see it.

He can say whatever he wants, but he didn't show any IRS or Department of Treasury publication or document, I believe.  I believe some schedule was shown with the dates on or about the 15th of April, but it didn't state specifically which date was required.

Did they even introduce any part of the IRS instructions for 1040?  Wouldn't you think the 1040, which is usually over 100 pages long, the instructions for it -- wouldn't you think there would be instructions in there that were admitted in evidence?  I didn't see them.

And what's in 100 pages of instructions for a 1040? That's interesting, I think.  Where was it?  Why didn't they show it to you?  It's incomplete.

In regards to Counts 6 and 7, making a false claim against the United States on a 1041 form, was my signature, my endorsement, on the back of either check?  It wasn't.

How can I claim liability on the checks if I wasn't given a chance to formally accept it, sign it, negotiate it, and give it back to them.  It's very interesting, isn't it?

Bankers Trust put their endorsement on it, and I believe they bear the burden of the liability for that check.  It's also their account number that was assigned to the Jeffrey Allan Kock Trust, not mine.  They generated that number.  They put that check in that I did not endorse into their account.  That's a fact.  I saw no evidence of me accepting that bank account from Bankers Trust.  I didn't accept that number.  All I did was use it.  It wasn't mine.  And I used it innocently too.

The first IRS witness -- I can't recall her name.  She was short, and I think she had a greenish dress on.  She said I requested a new check with, I believe, a 3911.  She said there was a request in there for an additional check or a new check to be issued.

The reason why that form was filled out is because it wasn't endorsed by me.  There were a couple different --

MR. KAHL:  Objection.  Not in evidence.

THE COURT:  Sustained, to the extent that you were providing information as to why something occurred that was not testified to by a witness under oath during this trial.

MR. KOCK:  Okay.

THE COURT:  You may argue based upon the evidence that

was admitted.

MR. KOCK:  Okay.

I believe she did state that one of the reasons that form was used was because the check wasn't endorsed or it was stolen; correct?

Did anyone state the reasons the returns were wrong? No.  The IRS witness in the gray suit, Mr. Roginsky, said he only had two forms to inspect and review, and he said he had nothing else.  And I asked him if he had any other forms or letters that were part of the return.  He stated no.

Did I ask that question for a reason?  Yes, I did, because it seems to be an incomplete investigation for the following reason:  Mr. Roginsky stated that he did not know what a 98 series tax identification number was that was listed on the 1041s.

Did I not ask him if it is a number assigned to a foreign entity?  I did.  If he doesn't know what a foreign entity is classified as, how could he know the intent and purpose of each 1041?  Do they not have different rules?  A 1041 and a 1040 are different by their own definitions, estates and trusts and individuals.

Think about the rules for a foreign entity.  It gets complicated, doesn't it?  But he didn't know what a foreign entity was, being a 98 number.  His testimony was incomplete and inconclusive as he didn't know all the facts that are

associated with all those returns.

Is there an accounting error on the part of the IRS? It's possible.  But did anyone state what is wrong with the returns specifically as far as accounting errors, or did they just speculate?  Wouldn't I be -- wouldn't I be amending the return as fast as possible to resubmit it if I was told exactly what was wrong with it?  Absolutely, I would.

I was not notified.  I was not given notice.  And I believe that's -- I believe that is in the record too.  And I would run and amend those real quick if I knew what was wrong.

MR. KAHL:  Objection.  Move to strike.

THE COURT:  The jury must disregard statements of intent or testimony by the defendant as he's arguing.  As I've told you, the evidence presented was that admitted under oath by the witnesses on the witness stand, and this is simply argument based upon what evidence was admitted and may be considered by you.

MR. KOCK:  Fair.  Forgive me.

Let's see here.  Again, the Government failed to prove beyond a reasonable doubt that there is any malicious intent here with those false claims.  The IRS didn't even know the claims I filed were wrong.  How was I supposed to know?  Is it forgivable?  Can people make mistakes?  I think so.

Let's see here.  To consider Count 8 of wire fraud and Count 9 of mail fraud, I would have to have had the deliberate

intention of planning a malicious attack through email to TaxAct which would forward that return to the IRS.  Okay?  And the same thing, creating a deliberate and malicious attack through the post office.

How stupid would that be?  Who do I think I am to pull something like that off?  Instead, could it be so simple that the rule of TaxAct would be returns under 10 million you have to eFile, send it through the wire?  What if it was so simple that the rule was over $10 million you have to put in a -- submit a paper return?

And you saw that.  There were human eyes laid on that paper return, yet that check was still issued.

Let's see here.  How dumb would it be just to email or mail a return with a bunch of false entries?  Of course you're going to get caught.  Why would somebody take a risk like that if they didn't have the confidence to think they knew what they were doing?

Does one put the returns on a boat or a plane or just drive them over somewhere?  Why penalize two very efficient actions of delivery?  Is there liability with those specific third-party delivery systems?

THE COURT:  Mr. Kock, you've started speaking more rapidly.

MR. KOCK:  Oh, forgive me.

THE COURT:  Thank you.  Please remember to speak

slowly for purposes of the jury's understanding and also the record.

MR. KOCK:  Gotcha.  Forgive me.

These charges of wire fraud and mail fraud are absolutely frivolous and are simply added on just to try and expand a flimsy case, I believe.

Intent is certainly not here on these counts, and the Government completely failed to prove intent on either count beyond a reasonable doubt.

Counts 10 and 12 of money laundering are absolutely ridiculous.  Did I or did I not just buy some nice cars?  I bought some nice cars.  Sorry.  I did it without any guilt, thinking I had finally made it in life and I was successful, yeah.

Was there any evidence that I tried to sell the cars for cash after purchase here?  I kept them.  They were in the driveway.  My sister, she testified up there.  She had one of them in her driveway because there was no room in my driveway. My parents' cars were in there.

Let's see here.  Now, what is money laundering?  It is the concealing of origins of money.  In other words, it is an attempt to hide the trail or chain of money.  Yet, were the simple transactions not cleared?

You saw the purchase agreements; correct?  How -- and the electronic -- or the checks came from the bank.  How do you

hide something like that?  There's a chain of custody with the check going to the dealership.

You heard the testimony of the witnesses from Bankers Trust that I told them I was buying vehicles.  These purchases are entirely and obviously traceable, nothing hidden or obfuscated, nothing hidden, very transparent.

The Government didn't have to put any effort into finding where the funds went.  Just ask them.  You know, there's no digging.  You know, that was easy, and it's because I wasn't laundering money.  I made some purchases of some nice cars.  Simple as that.  Therefore, the Government failed to meet its burden.

You heard Jodi Selby testify that I didn't make a single cash withdrawal from the account.  If I were truly to conceal where the money was going, why would I make those easily traceable purchases?

Have you ever seen somebody buy a candy bar in a convenience store with a $100 bill and get all the change back in 20s, 10s, 5s, and -- very suspicious.  That is possibly laundering money, as the one with the $100 bill may have come into -- had it come from a shady source and then washed it through the convenience store, breaking it up in smaller bills and passing the liability of the $100 bill on to the convenience store.

The Government has failed to prove beyond a reasonable

doubt that there were any -- that there was any money laundering in either count.  There's no bad intent here.

The final count, 13, concealment of an asset, is also frivolous.  From the beginning, Mr. Hadzic from Bankers Trust -- and his phone call to me was very alarming, as you'll recall.  He stated it was protocol just to call someone and ask them how they got their funds.  Did I not show concern that there was a shakedown by some miscellaneous envious third party happening in my questioning to Mr. Hadzic?

Recall what I just stated about the money laundering charges.  Did I just buy some nice cars guilt-free thinking I had finally made it and become successful?  Yes.

Did I not raise questions of the IRS breaching the Constitution to seize personal property of people without due process?  Is the Constitution not the supreme law of the land?  Which of you would just acquiesce to the taking of someone's automobile without inspecting all the paperwork?  Do you just go with it, or do you look -- do you inspect it?  Do you look at what you are given?  I like to look at it.

Can you imagine the confusion and chaos of several agents all over your lawn stating that they're here to take your property that you honestly believe is yours?  And, you know, these agents, you know, they have pistols on them, you know, they look intimidating, bulletproof vests, littered all over.  Just imagine that.  It's not fun.  I believe my sister

said something about it, and I can't remember what she said exactly, but I know it wasn't fun for her.

Now, wouldn't you question the constitutionality of this, having your property taken before due process?  I believe that's relatively the Fourth and Fifth Amendment.  To me, that is tyranny, and my rights to life, liberty, and the pursuit of happiness were not being secured at that time, which is, again, the purpose of government, as I stated in the beginning.

And why did Special Agent Todd Eklov not answer so many of my questions?  Wasn't his answer "can't answer that" frequently?  Why was that?  What was he concealing?  That's government.  Is this charge fair and just?  My life, liberty, and pursuit of happiness were not secured by government.

In addition, Magistrate Judge Bremer ordered -- I'm sorry -- her order stated the date of seizure was the year 3020.  How many of you have written by accident, like, on a check the last year because you've gotten so conditioned?  How many have gotten the first digit wrong?  Not me.  Very seldom.  I might still right 2019 today.

Should documents that claim to abrogate the Constitution not be 100 percent accurate?  Think about that for a minute.  Documents that abrogate -- they go around the Constitution.  The Constitution is the supreme law of the land.  How can documents like that abrogate it?  It's disturbing to me.

Is this not dangerous territory that sets someone up, like me, like my sister, to get hurt?  You know, we're not violent people.  We don't hurt anybody.

And how many people put their hands on that seizure order that didn't notice that error?  They still came to me to take the property.  They took it from my parents' place without the due process.  You heard them, and there was no due process to take my property at the time.

Additionally, you heard testimony that the Mercedes sedan the Government alleges I concealed was ultimately seized at my parents' house.  If I was going to conceal it, wouldn't the door have been locked?  Wouldn't it have been in a different location?  They brought back an order that was correct.  Why couldn't they do it the first time?

And that's a judge that did that.  Not to say that judges don't make errors, but I thought the 3020 error needed to be correct for a situation as serious as that.

In summary, no monetary loss was suffered by the Government.  Bankers Trust stated they repaid the funds, and the Government has seized the vehicles.

The burden of proof is on the Government, yet they did absolutely not prove intent in any way with respect to any of the counts charged.  Of the witnesses they produced, not a single witness testified regarding my intent.

Further, it seems highly unreasonable that the IRS

would send a check for over 10 million to a trust without due diligence, proving the money was owed before it was cut and sent.

Now, if you were harmed, would you want government to secure your rights of life, liberty, and the pursuit of happiness for you?  You would, wouldn't you?  That's why we're here.

If I have harmed a man, would they not have stated that in this trial?  Wouldn't the man have pointed at me and said, "That's him.  He hurt me.  He owes me."  I waited to hear that.

Ladies and gentlemen of the jury, I want you to find me innocent on all reasons I just stated plus, again, the second paragraph of the *Declaration of the Independence*.  I'm going to read it again.

We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable rights, that among these are life, liberty, and the pursuit of happiness -- that to secure these rights, governments are instituted among men, deriving their just powers from the consent of the governed.

This whole time I believe what I did was honest.  I don't -- I don't know if you watched over there.  I tried not to look over at the jury.

MR. KAHL:  Objection.

THE COURT:  Sustained.

MR. KOCK:  Placing a man in a box is interfering with his life, liberty, and pursuit of happiness, and my rights are unalienable, just as yours are.  It's a self-evident truth that we are all created equal.  I don't belong in a box, as it does compromise my life, liberty, and my pursuit of happiness.  I believe I have not committed any crimes, I have not breached my civil duty, and I have harmed no man, woman, or child.

And, lastly, think of those nine members of the Supreme Court and how often they unanimously agree on an issue on a case.  They are looking for a unanimous decision from you all.  All opinions and interpretations of the laws vary, just like the Supreme Court demonstrates.

Think really hard about that, and I need just one of you to go my way on each count, as I believe -- and I think -- I believe it's a fact that the Government has failed to prove any intent beyond a reasonable doubt on all these counts.  Consequently, your verdict must be not guilty on each count.  The Government's burden is a heavy one, and I believe they have failed to carry it, without a doubt.

I have listed some -- oh, excuse me.  I'm concluded, and I thank you for doing your duty as an American by being here.  Thank you all.

THE COURT:  Thank you, Mr. Kock.

On behalf of the United States, rebuttal argument?

MR. KAHL:  Yes.  Thank you, Your Honor.

I want to respond to just a couple of things, couple of points, that Mr. Kock made.

THE COURT:  Speaking directly into the microphone.

MR. KAHL:  Speaking directly into the microphone.

Thank you, Your Honor.

THE COURT:  Thank you, Mr. Kahl.

MR. KAHL:  Mr. Kock made some arguments suggesting that there was no evidence of somebody being injured.  If you look at the elements of the offenses charged, there is nothing about a, quote, injury as an element of any of the charges or counts before you.

As to the money laundering count, Mr. Kock said, well, there was no evidence of concealment of those transactions. I'll refer you to Final Instruction No. 14, which is the elements of the money laundering offense.  They have to do with engaging in certain monetary transactions of a value greater than $10,000.  There's nothing in that instruction, as to the money laundering, as to concealment.

Concealment is relevant as to Count 13.  That is the concealment of the Mercedes sedan when the defendant was personally advised that there was a seizure warrant, he was provided with the seizure warrant, he wrote a letter to the IRS asking that the seizure warrant be lifted.  This defendant knew there was a valid seizure warrant.  A typographical error

doesn't make him not guilty of that offense.

The defendant suggested that the IRS should have engaged in additional due diligence before paying the $10.9 million refund. As the judge has told you, that is not a defense, that is not relevant to what this defendant, Mr. Kock, did in this case.

When you begin your deliberations -- and you will take three things back to the jury room. You will take the evidence. The evidence is the testimony of the witnesses; it's the exhibits that you all have access to. You will have the judge's instructions on the law, the law that was given to you at the beginning of the case as well as the final jury instructions that we have been referring to here in closing argument.

But, importantly, you will take one more thing back with you. That's your common sense. You do not check your common sense at the door when you go in to deliberate. In fact, we rely on you to apply reason and common sense to the evidence and to the law that has been provided to you. And if you do that, I am confident that you will find this defendant, Jeffrey Allan Kock, guilty of Counts 1 through 13.

Thank you for your time and attention.

THE COURT: Thank you, Mr. Kahl.

Members of the jury, that concludes the argument portion of these proceedings. At this time I need to confirm

that all jurors are able to continue to serve in this matter.

I see everyone indicating as such.

As you know, from the outset of jury selection, we selected 12 jurors and two alternates.  That is incredibly important because we need to have 12 jurors to deliberate and to ensure that we have 12 jurors when a verdict needs to be decided.  That's why we have alternates.

By my records, initial venire Juror No. 34 and Juror No. 35, who are now seated in seats Juror No. 1 and No. 2 -- raise your hands if those are your original juror numbers.

(Show of hands.)

THE COURT:  Mr. Kahl, do you agree those are the alternates?

MR. KAHL:  I do.

THE COURT:  Mr. Kock?

MR. KOCK:  I do.

THE COURT:  At this time you will separate from the regular jurors.  You remain subject to the Court's admonition in regards to not talking about this case with each other or with anyone else, not doing any research, not texting, Tweeting, all of those things.

You remain subject to those admonitions because if something happens to one of the other 12 jurors and they are unable to continue with their service, one of you will be called upon to come in and begin deliberations again.  If that

happened, the entire deliberation process would start over. The jury would begin deliberating at the beginning with the newly constituted 12.

Do you each understand my instructions?

Raise your hand indicating so.

(Show of hands.)

THE COURT:  You do.  Thank you.

The rest of you, you will be given the final jury instructions and verdict form in this red binder.  This is the verdict form that you will be called upon to fill out.  Whoever the foreperson is, you'll return this binder to the Court at the conclusion of your deliberations.

I will remind you that you continue to be bound by all aspects of my admonition except for one, and that is that now not only are you not prevented from talking about this case with each other, but you're required to.  When you retire to deliberate, you will begin that process anew, but all other restrictions on your investigation or communication with others remain in place.

I will also remind you that at the beginning of trial, you were told that your personal communication devices -- cell phones, tablets, smart watches, and the like -- will be given to a clerk's office personnel during the course of deliberation, maintained, and then returned to you when you're done with your deliberations.

I will note that we utilize an electronic jury management system, so all of the evidence, except for physical exhibits, will be available to you electronically in this JERS system.  I encourage you to watch the tutorial at the beginning so that you understand how to utilize that, but that is how you will view the evidence.

You will receive a hard copy listing of the evidence, and you'll also receive the hard -- the physical exhibits that were admitted during the course of trial, and those matters will be given to you shortly after you retire to deliberate.

With those initial instructions and with the request for Jurors Nos. 1 and 2 to please provide my staff with the best phone number to reach you -- if you are required to come back for deliberations with the other jurors, I will call you and let you know that; otherwise, I will call you and let you know that you are released from the Court's admonition with the Court's thanks.

With those instructions, at this time we submit the case to the jury for your consideration.

We'll be in recess.  Thank you.

(Jury exited the courtroom at 12 p.m.)

THE COURT:  Thank you.  You may be seated.

We're outside the presence of the jury.

A couple matters to discuss.  First, after we conclude here, I will ask for Mr. Kock, with the assistance of Ms. Nash,

to confirm with counsel for the Government and the Government's paralegal that the listing of the exhibits to be returned to the jury room is correct, and then we'll release those to the jury at that time.

I have been notified, Mr. Kock, that on today's date you filed an affidavit of individual surety with the Court at document No. 97.  I must inquire as to the meaning of that document.

THE DEFENDANT:  I would just like to let it sit as it is.

THE COURT:  Are you asking the Court to take any action based upon the filing of that affidavit?

THE DEFENDANT:  Actually, yeah.  They are General Services Administration bonds.

THE COURT:  I'm sorry?

THE DEFENDANT:  They are General Services Administration bonds.

THE COURT:  And on what legal grounds do you believe that the Court should issue a bond to you?

THE DEFENDANT:  I don't believe the Court issued the bonds.  I deposited them with the Court.

THE COURT:  For what purpose?

THE DEFENDANT:  For settlement and release of surety.

THE COURT:  And what surety do you believe you are releasing?

THE DEFENDANT:  This body.

THE COURT:  Mr. Kahl, would you like to be heard in regards to the affidavit filed at document 97 filed under seal in this case?

MR. KAHL:  While I have not seen that affidavit, based on the description and based on what Mr. Kock has been saying, it does not appear to have any bearing on the criminal case and does not appear to require Court action.  The Government has no objection to that being maintained as part of the record.

THE COURT:  So the document has been filed in the Court's record.  It will be maintained in that file.  It has no bearing on the criminal proceeding in this case.  There is no -- as we have repeatedly discussed, this is not commercial litigation.  This is not a debt collection action.

This is a criminal proceeding instigated by the return of a criminal indictment by a grand jury in the Southern District of Iowa, and, as such, the bond posted, to the extent that it is such an individual surety from the defense, has no bearing on this case, and the Court takes no action in that regard.

Any additional record in that regard from the Government?

MR. KAHL:  No, Your Honor.

THE COURT:  From the defense?

THE DEFENDANT:  No, Your Honor.

THE COURT:  You all gave me your phone numbers at the beginning of trial.

Mr. Kock, you will be required to stay in the building while the jury deliberates.  You may not leave the building.

I would ask that Ms. Nash and the counsel for the Government remain available for response within five minutes should we receive either a question or a verdict by the jury. I will take no action on either a question or a verdict without first convening the parties to discuss or to receive that verdict.

Anything else that the Government needs to bring to my attention at this time?

MR. KAHL:  Just one question on the exhibits.  I assume that after the trial is over the Government will be filing them electronically with the court under the local rules.  I wanted to ask for permission to have those filed under seal given that they are replete with personal identifying information.

THE COURT:  Yes.

Similarly, Mr. Kock, although you did not end up offering and no exhibits were admitted on your behalf, you did provide them to the Court for identification purposes.  For purposes of the record, those should be maintained in the record of the court.  You can provide those for filing to the clerk's office for purposes of retaining those to ensure the

record is complete.

Do you understand the Court's instructions?

THE DEFENDANT:  I'm not sure I do.

THE COURT:  Okay.  Yesterday at the close of the day, we discussed Exhibits A1, A2, and A3 --

THE DEFENDANT:  Oh, okay.

THE COURT:  -- B1, B2, and B3 --

THE DEFENDANT:  I remember.  I wasn't sure what exhibits you were talking about.

THE COURT:  -- C, C1, and C2.

We discussed all of those exhibits.  You did not end up offering them, and they were not admitted, but for purposes of the record, because you identified them to the Court, they need to be maintained.  And you can approach the clerk's office and have those -- the clerk's office file those as identified exhibits by the defense so that they're maintained in this record.

Do you understand that?

THE DEFENDANT:  I believe so.

THE COURT:  And those would have to be the identical versions to the ones that we discussed here in court.

Anything else on behalf of the defense?

THE DEFENDANT:  No, Your Honor.

THE COURT:  We will notify the parties should we receive any communication from the jury.  Until that time, we

will be in recess.

(Recess taken at 12:06 p.m. until 1:38 p.m.)

(In open court, with the defendant present, outside the presence of the jury.)

THE COURT:  Thank you.  Please be seated.

We're on the record outside the presence of the jury in the matter of the United States of America versus Jeffrey Allan Kock, 4:21-cr-54.

I received a call at 1:27 indicating that the jury reached a verdict.

Mr. Kahl, are you prepared for the reading of the verdict?

MR. KAHL:  Yes, Your Honor.

THE COURT:  Mr. Kock, are you prepared for the jury to return its verdict?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Thank you.

At this time we will bring the jury in.

(Jury entered the courtroom at 1:39 p.m.)

THE COURT:  Thank you.  You may be seated.

We are back on the record in the matter of the United States of America versus Jeffrey Allan Kock.  This is Case No. 4:21-cr-54.  The jury, the attorneys, and the defendant are present here in open court at 1:39 p.m. on September 29, 2021.

This matter was tried to a jury in open court, the

case was submitted to the jury, and the Court has been notified the jury has reached its verdict.

Who is the jury foreperson?

THE FOREPERSON:  (Raises hand.)

THE COURT:  Sir, were you venire member No. 17 and now Juror No. 8?

THE FOREPERSON:  That is correct.

THE COURT:  And has the jury reached a verdict on all 13 counts?

THE FOREPERSON:  We have.

THE COURT:  Are each of those verdicts unanimous?

THE FOREPERSON:  They are.

THE COURT:  Have you utilized the original verdict form provided to you by the Court and signed it on behalf of the jury?

THE FOREPERSON:  Yes, we have.

THE COURT:  My courtroom deputy will now approach and take the verdict form from you along with the jury instructions and will deliver them to me.

You will now listen to the reading of the verdicts by the Court.

The United States of America, Plaintiff, versus Jeffrey Allan Kock, Defendant; Verdict Form.

Count 1.  With respect to the crime of willful failure to file an individual income tax return for the calendar year

2014, as charged in Count 1 of the indictment, we, the jury, unanimously find the defendant, Jeffrey Allan Kock, guilty.

Count 2.  With respect to the crime of willful failure to file an individual income tax return for the calendar year 2015, as charged in Count 2 of the indictment, we, the jury, unanimously find the defendant, Jeffrey Allan Kock, guilty.

Count 3.  With respect to the crime of willful failure to file an individual income tax return for the calendar year 2016, as charged in Count 3 of the indictment, we, the jury, unanimously find the defendant, Jeffrey Allan Kock, indicated guilty.

Count 4.  With respect to the crime of willful failure to file an individual income tax return for the calendar year 2017, as charged in Count 4 of the indictment, we, the jury, unanimously find the defendant, Jeffrey Allan Kock, indicated guilty.

Count 5.  With respect to the crime of willful failure to file an individual income tax return for the calendar year 2018, as charged in Count 5 of the indictment, we, the jury, unanimously find the defendant, Jeffrey Allan Kock, indicated guilty.

Count 6.  With respect to the crime of making a false claim against the United States on an IRS Form 1041 for the calendar year 2018, as charged in Count 6 of the indictment, we, the jury, unanimously find the defendant, Jeffrey Allan

Kock, indicated guilty.

Count 7.  With respect to the crime of making a false claim against the United States on an IRS Form 1041 for the calendar year 2019, as charged in Count 7 of the indictment, we, the jury, unanimously find the defendant, Jeffrey Allan Kock, indicated guilty.

Count 8.  With respect to the crime of wire fraud, as charged in Count 8 of the indictment, we, the jury, unanimously find the defendant, Jeffrey Allan Kock, indicated guilty.

Count 9.  With respect to the crime of mail fraud, as charged in Count 9 of the indictment, we, the jury, unanimously find the defendant, Jeffrey Allan Kock, indicated guilty.

Count 10.  With respect to the crime of money laundering with respect to a cashier's check in the amount of $146,271.80 for the purchase of a 2020 Mercedes-Benz E63 sedan, as charged in Count 10 of the indictment, we, the jury, unanimously find the defendant, Jeffrey Allan Kock, guilty.

Count 11.  With respect to the crime of money laundering with respect to a cashier's check in the amount of $122,556.05 for the purchase of a 2017 Mercedes-Benz G63 SUV, as charged in Count 11 of the indictment, we, the jury, unanimously find the defendant, Jeffrey Allan Kock, indicated guilty.

Count 12.  With respect to the crime of money laundering with respect to a cashier's check in the amount of

$117,581.70 for the purchase of a 2019 Mercedes-Benz SL450 coupe, as charged in Count 12 of the indictment, we, the jury, unanimously find the defendant, Jeffrey Allan Kock, guilty.

Count 13.  With respect to the crime of concealment of an asset, as charged in Count 13 of the indictment, we, the jury, unanimously find the defendant, Jeffrey Allan Kock, indicated guilty.

Signed and dated by the foreperson as indicated.

Members of the jury, is that your verdict?

(Jury indicated in the affirmative.)

THE COURT:  So say you all?

(Jury indicated in the affirmative.)

THE COURT:  Any request for polling from the Government?

MR. KAHL:  No, Your Honor.

THE COURT:  Request for polling from the defense?

MR. KOCK:  I actually didn't understand that.

THE COURT:  You have the right to have the Court ask each individual juror member or each individual member of the jury, jurors, if the verdicts that I read are their verdict.

Do you wish me to poll the jury at this time?

MR. KOCK:  Oh, no.  No, Your Honor.  No.

THE COURT:  Based upon the jury's verdict, I adjudicate the defendant guilty and order the Clerk of Court to file these verdicts as guilty on all 13 counts.

Members of the jury, thank you for your jury service in this matter. I now will release you from the admonition that I gave you repeatedly during the course of the trial not to talk or text or Tweet about these matters. After you are discharged, you may, if you choose, discuss your deliberations or this case with anyone that you wish.

You must determine for yourself whether you want to do so. You are under no obligation to do so, and you should think carefully about any comments you make about your deliberations and be comfortable talking about that in open court in regards to any comments that you make.

This nation has placed great faith in private citizens acting as jurors to reach fair and objective decisions in matters of great importance. You all have participated in that tradition here this week. I hope you look back upon your jury service as both a privilege and a responsibility of citizenship.

Though jury service was an interruption to your regular daily life -- and under these conditions with COVID-19, perhaps an even greater burden than is otherwise typical -- we greatly appreciate your service and hope you have enjoyed your experience as a juror and found it rewarding.

As I have said repeatedly, the right to a trial by jury is enshrined in the United States Constitution, and you have played an integral part in our system of justice here this

week.

I have found it very helpful over the years to visit with jurors after the conclusion of trial to talk with them about their jury experiences so we can see what we can do better as a court and to learn from you from your perspective. You do not have to talk to me about your service as a juror here this week, but if you have a few moments and you'll wait in the jury room, I will come talk with you after I go over some matters with the parties.

With that, I will discharge you as jurors. You should note that this service completes your jury service to the Southern District of Iowa for this call, meaning you do not have to call in on Friday to see if there's another jury that you can serve on. Your jury service is complete.

Again, I thank you and give you the thanks of the Court for your service this week. You are discharged as jurors, and you may leave the courtroom at this time. You may take your binders with you and leave those in the jury room for destruction.

(Jury exited the courtroom at 1:49 p.m.)

THE COURT: Thank you. You may be seated.

We're outside the presence of the jury.

We have just received the verdict of the jury, and I have adjudicated the defendant guilty on all 13 counts.

What's the Government's position on detention pending

sentencing?

MR. KAHL:  At this time the Government would ask that the defendant be detained.  We believe that he's a flight risk. We note that the burden has now shifted now that there is a guilty verdict.

We also note that the defendant's willingness to abide by the directives of the Court seems to have been conditional as we proceeded through this case, so I think it is unlikely that he will abide by release conditions, so we ask that he be detained at this time.

THE COURT:  Thank you.

Mr. Kock?

THE DEFENDANT:  Uh-huh.

THE COURT:  The Government has moved for your detention pending sentencing in this matter.  At your original appearance in front of the Court, the burden was on the Government to demonstrate that you are a risk of flight or danger to the community or that you will fail to comply with the Court's orders in this case.  Now the burden is on you. The Government has moved for you to be detained.

Would you like to be heard by way of argument as to why you should remain on terms and conditions in the community?

THE DEFENDANT:  Yeah.  I would like to be heard.

Number one, during the whole pretrial release, you know, I made one error, I missed one court appointment, and I

paid for it, you know, being arrested and held in Polk County for about 30 hours.  And I explained to Judge Locher that was a mistake.  I thought it was a telephone hearing.

I don't have a car.  I don't -- I really don't own anything.  I don't have anything left in my life.  These are the same clothes I wore two days ago.

And, actually, I help my mom at home.  I'm the one that picks her up when she falls, so -- I believe my father sent you a letter today.  I don't know if you've gotten it yet. I help him take care of her, and, actually, I take care of him around the house.

I would just like a little bit of time to help get things in order.  Like I said, I don't -- you know, I have nowhere to go.  I don't abandon family.  Des Moines is my home. I don't have anywhere to go, honestly.

THE COURT:  Thank you, Mr. Kock.

So the Court is applying the standard set forth in 18, United States Code, Section 3143 in considering whether or not the defendant should remain in the community.

The Court notes that throughout the course of trial, the defendant has struggled to comply with the Court's orders. The defendant has indicated repeatedly that he has made mistakes, although the frequency and nature of those mistakes indicated a willingness to disregard the Court's orders.

I have concerns, and I think the Government's motion

is well made in that those actions demonstrate challenges in regards to compliance with the Court's orders on terms and conditions in the community.  I also find that the defendant has not continually recognized the authority of this Court in manners that make his compliance also unlikely.

There is a risk of flight present based upon the fact that he has not demonstrated a recognition of this Court's authority, the pendency of this matter as a criminal proceeding, and for all of those reasons, after considering all of the relevant statutory factors under 18, United States Code, Section 3143, and all of the pertinent case law applying that statute, the Court does remand the defendant to the detention of the United States Marshal pending sentencing in this matter.

Mr. Kock, I would like to talk with you about appointment of counsel.  You have received the benefit of standby counsel throughout this trial.  It seems that you have worked well with standby counsel in presenting your case to the Court.

As we prepare for sentencing, there are issues that are challenging even to lawyers, much like trial.  In light of that, I would ask you to consider whether you wish to have an attorney assist you in, for example, preparing post-trial motions, responding to the Court's orders in regards to the preparation of a presentence investigation report, and then presenting your arguments at sentencing.

At this time, do you wish to continue to represent yourself, or are you amenable to the appointment of counsel to assist in your defense in preparation of sentencing?

THE DEFENDANT:  How long of a wait is sentencing?

THE COURT:  I will set sentencing for February 4, 2022, at 10:00 a.m.

THE DEFENDANT:  So I'll be detained for -- until that time?

THE COURT:  Yes, sir.

THE DEFENDANT:  Without possibility of getting out to help my father do anything?

THE COURT:  You and/or your attorney can file a motion to reconsider detention at any time based upon a change of circumstance, and the Court or a magistrate judge will consider at that time whether or not circumstances have changed sufficient to warrant your release in the community under terms and conditions.

THE DEFENDANT:  Okay.  Yeah.  I'll take some help.

THE COURT:  So you accept appointment -- you will accept appointment of counsel for matters in relation to post-trial motions and sentencing?

THE DEFENDANT:  Yes.

THE COURT:  Ms. Nash, are you aware if you're available to accept the appointment?

THE DEFENDANT:  I am, Your Honor.

THE COURT: So the Court will appointment Ms. Nash as the defendant's attorney in full moving forward with the defendant's consent.

I urge the parties to comply with the Court's administrative order in effect as to the preparation of necessary documents for sentencing.

As Ms. Nash knows, Mr. Kock, you have 14 days from today's date to file any relevant post-trial motions, including renewed motion for judgment of acquittal or motion for a new trial.

As I said, sentencing is set for February 4, 2020, at 10:00 a.m. in Courtroom 160.

I would remind the parties that you provide immediately to my staff any remaining jury materials that you have. I know that the unredacted versions were already taken for destruction by the Court, but I believe that some redacted versions remain. If they do remain, you must return those hard copies to the Court immediately after sentencing.

Any additional record in this regard from the Government?

MR. KAHL: No, Your Honor.

THE COURT: From the defense, Mr. Kock?

THE DEFENDANT: I have nothing.

THE COURT: Ms. Nash?

MS. NASH: No, Your Honor.

THE COURT:  Thank you.

We'll be in recess until sentencing.  Thank you.

(The jury trial concluded at 1:57 p.m.)

CERTIFICATE

I, Chelsey Wheeler, a Certified Shorthand Reporter of the State of Iowa and Federal Official Realtime Court Reporter in and for the United States District Court for the Southern District of Iowa, do hereby certify, pursuant to Title 28, United States Code, Section 753, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-titled matter and that the transcript page format is in conformance with the regulation of the Judicial Conference of the United States.

DATED this 28th day of October, 2021.


/s/ *Chelsey Wheeler*

Chelsey Wheeler
Certified Shorthand Reporter